The SOCIETY OF LLOYD'S, Plaintiff,

v.

J. Edmund MULLIN, Defendant.

No. CIV.A. 02–1193.

United States District Court,
E.D. Pennsylvania.

March 27, 2003.

Mark E. Gebauer, Eckert Seams Cherin, et al., Philadelphia, PA, Ron S. Chima, Eckert Seams Cherin and Mellott, L.L.C., Harrisburg, PA, for Plaintiff.

Steven H. Lupin, Hamburg, Rubin, Mullin & Maxwell, Lansdale, PA, Theodore W. Grippo, Jr., Pembroke & Brown, Park Ridge, IL, for Defendant.

## MEMORANDUM

RUFE, District Judge.

This is an action for enforcement of a foreign judgment. Presently before the

Court is Plaintiff's Motion for Summary Judgment. For the reasons set out below, Plaintiff's Motion is granted.

## I. BACKGROUND

The following facts are not in dispute, unless otherwise noted. Plaintiff in this case is The Society of Lloyd's ("Lloyd's"), a corporation organized and existing by special Acts of the Parliament of the United Kingdom. Lloyd's is not an insurer, and does not insure risks. Rather, pursuant to a succession of Parliamentary Acts, the Lloyd's Acts 1871–1982, Lloyd's is charged with the duty and authority to regulate an English insurance market located in London. Among its regulatory responsibilities, Lloyd's promulgates and enforces regulations in accordance with its powers and obligations under the Lloyd's Acts, and exercises disciplinary authority over persons in the Lloyd's market. Members of the Lloyd's market, also known as "Names," are the only providers of insurance in the Lloyd's market. Names underwrite insurance in groups known as syndicates, but their obligations to pay claims on the policies they underwrite is personal and direct.

Defendant is J. Edmund Mullin ("Mullin"), an individual residing in Pennsylvania, and a former Name in the Lloyd's market. In order to become a Name, Mullin entered into certain agreements governing his membership of and underwriting in the Lloyd's market. One of those agreements, the General Undertaking, required Mullin to (a) comply with the provisions of the Lloyd's Acts and any bylaws, regulations, etc. in connection with his membership of and underwriting at Lloyd's; and (b) to submit any dispute arising out of or relating to his membership of, and/or underwriting of insurance business at, Lloyd's for resolution by the English Courts applying English law. *See* General Undertaking at ¶¶ 1–2.3, attached to Plaintiff's Motion at Ex. A, Tab 1 (hereinafter, "General Undertaking").

In the late 1980s and early 1990s, the Lloyd's market incurred huge financial losses that threatened to destroy the London insurance market.[1] Many Names either refused or became unable to satisfy their obligations to policyholders to make payments of valid claims. Consequently, a significant amount of litigation followed. In response, Lloyd's implemented the 1996 Reconstruction and Renewal Plan (the "R & R"). The R & R required that each Name purchase reinsurance for his underwriting obligations on 1992 and prior underwriting years of account from a newly formed company, Equitas Reinsurance Ltd. (the "Equitas Reinsurance Contract"). As such, each Name, including Mullin, was required to pay Equitas a reinsurance premium (the "Equitas Premium").[2] The English courts have held that Lloyd's had the statutory authority to implement the R & R, including that aspect of the R & R that mandated that Names purchase reinsurance from Equitas. *See Society of Lloyd's v. Lyons, Leighs & Wilkinson,* (C.A. 31 July 1997), attached to Plaintiff's Motion at Ex. F.

Mullin refused to pay the Equitas Premium. After Equitas assigned to Lloyd's its right to recover payment of the Equitas Premium, Lloyd's commenced proceedings in the High Court of Justice, Queen's Bench Division (the "English Court") against Mullin for payment of the unpaid Equitas Premium plus unpaid interest and

---

**1.** Mullin alleges that numerous claims related to asbestos-related injuries created a shortfall in syndicate reserves and impacted Lloyd's profitability.

**2.** Much of this history is also recounted in the Seventh Circuit's opinion in *Society of Lloyd's v. Ashenden,* 233 F.3d 473, 478 (7th Cir.2000).

costs (the "English Action"). Mullin entered an appearance in the English Court, and did not dispute its jurisdiction over him, but did raise numerous defenses during the English Action. The English Court ruled against Mullin on each of the defenses he asserted against his obligation to pay the Equitas Premium,[3] and entered judgment in Lloyd's favor on March 11, 1998 (the "English Judgment"). To date, the English Judgment remains unsatisfied, and led to the instant matter.

On March 8, 2002, Lloyd's filed its Complaint in this Court, seeking enforcement of the English Judgment against Mullin. Lloyd's moved for summary judgment thereafter, and the motion is now ripe for a decision.[4] This Court's jurisdiction is premised on diversity of citizenship, and Pennsylvania law governs. *See* 28 U.S.C. § 1332; *Choi v. Kim*, 50 F.3d 244, 248 n. 7 (3d Cir.1995) (holding in diversity cases without any federal question, state law governs district court's determination of whether to recognize a foreign country judgment).

## II. STANDARD OF REVIEW ON SUMMARY JUDGMENT

The underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Under Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

Lloyd's moves for summary judgment, arguing that it is entitled to recognition and enforcement of the English Judgment against Mullin under Pennsylvania's Uniform Foreign Money Judgments Recognition Act, 42 P.S. §§ 22001–22009 (the "Recognition Act"), and the Uniform Enforcement of Foreign Judgments Act, 42 Pa. Cons.Stat. Ann. § 4306 (the "Enforcement Act"). Mullin does not contest

---

**3.** Mullin and other Names pressed numerous defenses in a series of test cases heard in the English courts prior to the English Action. They argued that (1) Lloyd's lacked the regulatory authority under the Lloyd's Acts to mandate that all Names purchase reinsurance coverage from Equitas; (2) Names were entitled to rescind their membership of Lloyd's as a result of alleged fraudulent inducement to sign the General Undertaking; (3) Names were entitled to litigate claims of fraudulent inducement as a setoff or counterclaim to their obligation to pay the Equitas Premium; and (4) Names were not bound by the "pay-now-sue-later" and "conclusive evidence" provisions of the Equitas Reinsurance Contract. The English courts rejected each of these defenses. *See Society of Lloyd's v. Fra-*

*ser & Ors.*, (Q.B. 3 Dec. 1997), *aff'd, Society of Lloyd's v. Fraser & Ors.*, (C.A. 31 July 1998); *Society of Lloyd's v. Wilkinson & Ors.* (Q.B. 23 April 1997), *aff'd, Society of Lloyd's v. Lyon, Leighs & Wilkinson* (C.A. 31 July 1997); *Society of Lloyd's v. Fitgerald, Leigh and Ors.,* (Q.B. 20 Feb. 1997), *aff'd, Society of Lloyd's v. Lyon, Leighs & Wilkinson* (C.A. 31 July 1997), attached to Plaintiff's Motion at Exs. D, E, F, H, I.

**4.** Mullin suggested in a letter to the Court that oral argument should be heard on the pending motion. Rather than entertain oral argument, the Court permitted further briefing. *See* Order, dated October 25, 2002 [Doc. # 13].

whether Lloyd's has satisfied the requirements of the Enforcement Act. Rather, he argues that this Court should not recognize the judgment under the Recognition Act.

Under the Recognition Act, a judgment by a foreign court granting a sum of money is enforceable in Pennsylvania "in the same manner as the judgment of another state which is entitled to full faith and credit," provided the judgment is "final and conclusive and enforceable where rendered...." 42 P.S. §§ 22003, 22009. Mullin does not contend that the English Judgment is not final, conclusive, and enforceable in England. *See* Answer ¶ 39. However, there are discretionary and non-discretionary exceptions to the Recognition Act, and Mullin contends that some of the exceptions apply here.

## A. The English Judgment Was Rendered Under a System That Is Compatible With Due Process

■ First, Mullin argues that the Court should not recognize the English Judgment because it was rendered in the absence of due process. Under § 22005(1) of the Recognition Act, a foreign judgment is "not conclusive" and thus cannot be recognized if, *inter alia*, "the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law." As the Seventh Circuit noted when construing identical statutory terms, the statute directs courts to focus on the foreign judicial "system," and whether such "system" provides fair tribu-

nals compatible with due process. *See Society of Lloyd's v. Ashenden*, 233 F.3d 473, 476 (7th Cir.2000). When confronted with an argument that the courts of England do not meet this benchmark, Judge Richard A. Posner dismissed such an averment as bordering on the "risible." *Id.* (noting structural and procedural parallels between English and U.S. judicial systems); *see also Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 958 (10th Cir.1992) ("[T]he courts of England are fair and neutral.").

■ In support of his argument, Mullin asserts that the English Judgment was obtained through procedures that contravene due process. Specifically, he objects to the English Court's enforcement of the "pay-now-sue-later" clause, which prohibited Mullin from raising certain defenses and counterclaims during the English Action. As noted *supra* at note 3, the Names, including Mullin, presented this argument to an English court, and it was rejected. Mullin would have this Court revisit the English Action and other decisions of the English courts to inquire into whether the proceedings conformed to the requirements of due process of law. This is not required under the Recognition Act. As noted above, the Court must restrict its inquiry to a panoramic examination of the English judiciary, *i.e.*, the English "system." As the Seventh Circuit noted in *Ashenden*, the integrity and fairness of the English courts are "not open to doubt." 233 F.3d at 477 (rejecting argument that courts should examine particular judgments, as opposed to judicial systems).[5]

5. The parties have submitted no evidence to the Court that would substantiate the fairness and neutrality of the English courts. However, no such evidence is required. As Judge Posner noted, when determining whether a nation's courts are committed to principles of due process, "a federal court is not limited to the consideration of evidence that would be admissible under the Federal Rules of Evi-

dence; any relevant material or source may be consulted." *Ashenden*, 233 F.3d at 477. The Court is more than satisfied that the learned opinions of the judges of the United States Courts of Appeal are an adequate source upon which to conclude that the English system is compatible with the requirements of due process of law. *See, e.g., Society*

Although it is not required under the Recognition Act, the Seventh Circuit conducted a detailed evaluation of the "particulars" of the English court decisions that Mullin condemns. The *Ashenden* court found that those decisions were consistent with due process, and this Court agrees with that assessment. *See id.* at 478–481. Accordingly, the Court rejects Mullin's contention that the exception found in § 22005(1) of the Recognition Act applies.

## B. The English Judgment Was Not Obtained By Fraud

■ Next, Mullin argues that the English Judgment was obtained by fraud. The Enforcement Act permits nonrecognition of a foreign judgment if "the judgment was obtained by fraud." 42 P.S. § 22004(2). The plain text of the Recognition Act gives the Court discretion when this ground is asserted. *See id.* ("A foreign judgment *need not be* recognized if: . . . .") (emphasis added).

Mullin's memoranda of law deliver a stentorian criticism of substantive and procedural aspects of the English Action. If Mullin intends to impress upon the Court his deep frustration with having lost his case in the English courts, he can rest assured his frustration is duly noted. Yet, Mullin's diatribe is a repackaging of arguments already considered and rejected by several English courts. This Court is not the appropriate forum for relitigating the issues conclusively determined in the English Action. Rather, the only issues presented are whether the Court should recognize and enforce the English Judgment under governing Pennsylvania law, *i.e.*, the Recognition Act. Accordingly, the Court's analysis is limited to the issues presented by the text of the statute.

Mullin has failed to demonstrate that the English Judgment "was obtained by fraud." 42 P.S. § 22004(2). In support of this argument, Mullin contends that he was fraudulently induced to sign the General Undertaking because, at the time he was recruited as a Name, Lloyd's did not fully disclose the extent of its exposure to asbestos claims, or the financial health of its reserves. As such, he argues, the English Judgment is premised on fraud.

■ Mullin misapprehends the scope of the exclusion, and the meaning of "obtained by fraud." Whether Lloyd's properly obtained his assent to the General Undertaking is beyond the scope of this Court's inquiry. Rather, the fraud "must relate to matters other than issues that could have been litigated and must be a fraud *on the court.*" *Fairchild, Arabatzis & Smith, Inc. v. Prometco (Produce & Metals) Co., Ltd.,* 470 F.Supp. 610, 615 (S.D.N.Y.1979) (emphasis added) (citation omitted) (construing the "obtained by fraud" exception to the New York Recognition Act, N.Y. C.P.L.R. § 5304(b)(3), which is identical to Pennsylvania's Recognition Act). Mullin presents no evidence that the English Judgment (as opposed to Mullin's assent to the General Undertaking) was fraudulently obtained, and thus the Court rejects his contention to the contrary. *See also Ackermann v. Levine,* 788 F.2d 830, 841 (2d Cir.1986) (citing *Fairchild,* 470 F.Supp. at 615, and rejecting argument that foreign judgment was fraudulently obtained); *Farrow Mortgage Servs. Pty., Ltd. v. Singh,* 1995 WL 809561, at *3 (Mass.Super. Mar. 30, 1995) (rejecting argument that plaintiff fraudulently induced defendant's signature of guarantee as irrelevant to "obtained by fraud" exception because it does not relate

of *Lloyd's v. Turner,* 303 F.3d 325, 331 (5th Cir.2002) ("the courts of England are fair and

neutral forums"); *Ashenden,* 233 F.3d at 477.

to court proceedings), *aff'd,* 42 Mass.App. Ct. 1103, 675 N.E.2d 445 (1997), *rev. denied,* 424 Mass. 1107, 678 N.E.2d 1333 (1997).

## C. The English Judgment Is Not Repugnant to Pennsylvania Public Policy

■ Finally, Mullin devotes the bulk of his memoranda to arguing that recognition of the English Judgment would be contrary to Pennsylvania public policy. The Recognition Act permits nonrecognition of a foreign judgment if "the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of the Commonwealth." 42 P.S. § 22004(3). Like the fraud exception discussed in Part III.B., application of this exception is discretionary. *See id.* Although Mullin's arguments are eloquently presented, they are ultimately unpersuasive.

■ Mullin's first argument on this point is a slight variation on his "fraud" argument discussed above in Part III.B. Specifically, Mullin contends that he was fraudulently induced to sign the General Undertaking by Lloyd's misrepresentations of material fact, and that obtaining assent to a contract by these means offends Pennsylvania public policy. Of course, a contract obtained by a misrepresentation of a material fact is avoidable under Pennsylvania law. *Germantown Mfg. Co. v. Rawlinson,* 341 Pa.Super. 42, 491 A.2d 138, 141 (1985). Therefore, so the arguments goes, this Court should not recognize a judgment rooted in a contract that Pennsylvania courts would not enforce over the objections of one of the contractual parties.

In support of this argument, Mullin points to certain findings contained in a decision of the English Court of Appeal, *Jaffray & Ors v. Society of Lloyd's,* 2002 WL 1654876 (C.A. 26 July 2002). In Jaffray, the court rejected an argument by certain Names (Mullin not included) that Lloyd's *knew* that representations in its brochures about the integrity of its auditing procedures were false when made, or that Lloyd's made the representations recklessly as to whether they were false. Although Mullin concedes that Lloyd's prevailed in *Jaffray* on this particular issue, he argues that the *Jaffray* opinion includes findings by the court that, when extrapolated and pieced together, dictate the legal conclusion that Lloyd's made *negligent* misrepresentations of material fact regarding its audits. *See Jaffray* at ¶¶ 321, 323–24, 375–76. Proceeding from this premise, Mullin argues that the English Judgment is repugnant to Pennsylvania public policy because it is based on a fraudulently induced contract, the General Undertaking. Similarly, Mullin points to Pennsylvania securities laws as evidence of the Commonwealth's policy of protecting investors against fraud.

The terms of the Recognition Act permit nonrecognition if "the *cause of action or claim for relief on which the judgment is based* is repugnant" to Pennsylvania public policy. 42 P.S. § 22004(3) (emphasis added). Neither the parties' memoranda nor the Court's own research reveal any Pennsylvania cases construing these terms. However, there is sufficient persuasive authority available to guide the Court's decision.

For example, in *Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435 (3d Cir.1971), in a case decided before Pennsylvania adopted its version of the Uniform Foreign Money Judgment Recognition Act, the Third Circuit considered a case involving a British corporation seeking to enforce a judgment entered against an American corporation by the same court that entered the English Judgment in this case, *i.e.,* the High Court of Justice,

Queen's Bench Division. *Id.* at 436–37. Prior to the enactment of the Recognition Act, Pennsylvania courts looked to the principle of comity when deciding whether to enforce judgments rendered in a foreign nation. Comity, the court noted, "is not a rule of law, but one of practice, convenience, and expediency." *Id.* at 440. "Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Id.* Withholding comity on public policy grounds, the court explained, should only occur "in the clearest cases." *Id.* at 443 n. 15 (quoting *Mamlin v. Genoe*, 340 Pa. 320, 17 A.2d 407, 409 (1941)).

The judgment rendered against the American corporation in *Somportex* arose out of a breach of contract action, and the English court awarded damages that would not be recoverable under Pennsylvania common law: "loss of good will" and attorneys' fees. *See id.* at 443. In the enforcement action, the American defendant argued that enforcement of the foreign judgment would be contrary to Pennsylvania public policy because such a claim for relief could not be maintained in Pennsylvania. *See id.* The Third Circuit rejected this argument:

> [W]hile Pennsylvania may not agree that these elements should be included in damages for breach of contract, the variance with Pennsylvania law is not such that the enforcement tends clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security of individual rights, whether of personal liberty or of private property, which any citizen ought to feel, is against public policy. *Id.* (internal quotes and citations omitted).

Therefore, it is evident from *Somportex* that substantive differences between Pennsylvania law and the law of the nation that rendered the judgment do not automatically trigger a public policy exception.[6] Rather, such differences must present a substantial risk to fundamental public values against which only nonrecognition of the judgment can protect. As such, the standard is unquestionably a high one.

The Uniform Foreign Money Judgment Recognition Act was an attempt to codify common law principles related to recognition of foreign judgments. *See generally* Jay M. Zitter, Annotation, *Construction and Application of Uniform Money Judgments Recognition Act*, 2001 WL 487102, 88 A.L.R.5th 545 (2001). Other states have addressed the scope of the public policy exception to the statute, and have utilized the same high standard embraced by the *Somportex* court. For example, the district court in *McCord v. Jet Spray International Corp.*, 874 F.Supp. 436, 439 (D.Mass.1994), interpreting Massachusetts' version of the Recognition Act, stated that the "public policy exception operates only in those unusual cases where the foreign judgment is 'repugnant to fundamental notions of what is decent and just in the State where enforcement is sought.'" (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C.Cir.1981)); *see also Society of Lloyd's v. Turner*, 303 F.3d 325, 332 (5th Cir.2002) (construing Texas Recognition Act, and noting, "[t]o deny enforcement of a foreign judgment based on a public policy argument, the level of contravention of

---

**6.** This principle continues to adhere to the Uniform Foreign Money Judgment Recognition Act in other states. *See, e.g., Society of Lloyd's v. Turner,* 303 F.3d 325, 332–33 (5th Cir.2002) (holding, under Texas' version of the Recognition Act, that public policy exception is not triggered "simply because the body of foreign law upon which the judgment is based is different from the law of the forum or because the foreign law is more favorable to the judgment creditor than the law of the forum").

Texas law has to be high.") (internal quotes omitted).

Turning to the text of the statute, the Court must focus on the "cause of action" or "claim for relief." 42 P.S. § 22004(3). This narrows the scope of the Court's inquiry significantly.

Taking these standards into account, the Court does not hesitate to conclude that Mullin's argument fails to meet the high threshold for nonrecognition on public policy grounds. Lloyd's cause of action in the English Action was for breach of contract. There is no support for any contention that a cause of action for breach of contract is repugnant to Pennsylvania public policy. *See Turner,* 303 F.3d at 333 (affirming recognition of judgment obtained by Lloyds against a Name, and rejecting argument that breach of contract cause of action contravenes Texas public policy); *Southwest Livestock & Trucking Co. v. Ramon,* 169 F.3d 317, 321 (5th Cir.1999) (holding "cause of action for collection on a promissory note" is not repugnant to Texas public policy); *cf. J.F.Walker Co., Inc. v. Excalibur Oil Group, Inc.,* 792 A.2d 1269, 1272 (Pa.Super.2002) (listing essential elements of breach of contract claim under Pennsylvania law). Nor is there any support for a contention that the claim for relief sought here, an award of money damages, is repugnant to Pennsylvania public policy. *Cf. Ferrer v. Trustees of Univ. of Pennsylvania,* 825 A.2d 591, 2002 WL 31886791 (Pa. Dec. 30, 2002) (reducing, but reinstating, award of money damages on breach of contract claim). The fact that Pennsylvania courts might reach a different conclusion if the same breach of contract action were pursued in Pennsylvania does not mean the "cause of action" asserted in the English Judgment is repugnant to Pennsylvania public policy.

Mullin's second argument directed at the public policy exception harkens back to the method by which he became bound to the Equitas Reinsurance Contract. As explained in Mullin's affidavit, Lloyd's first demanded Mullin pay the Equitas Premium in 1996. Only subsequently did Mullin learn that the Equitas Reinsurance Contract had been entered into on Mullin's behalf by an agent appointed for him by Lloyd's. Mullin never personally approved or signed the Equitas Reinsurance Contract. Mullin Aff. at ¶¶ 7–8. Given the circumstances by which he became bound, Mullin argues, the Equitas Reinsurance Contract offends Pennsylvania public policy.

There are two components to this argument. First, Mullin attempts to reinvent his due process argument, already rejected above, by contending that certain provisions of the Equitas Reinsurance Contract deprived him of due process, and thus violate Pennsylvania public policy. The Equitas Reinsurance Contract contains a "pay-now-sue-later" clause, which requires the Names to pay the Equitas Premium first, and to litigate any challenges to it subsequently. *See* Equitas Reinsurance Contract at ¶ 5.5, attached to Defendant's Response to Plaintiff's Motion at Ex. D. In addition, it contains a "conclusive evidence" clause, which prohibits discovery into the calculations of the Equitas Premium. *See id.* at ¶ 5.10. Mullin argues that these clauses operated to preclude him from receiving due process. This argument is only a slight variation on his arguments already addressed above: that the English Judgment should not be enforced because it was rendered under a system incompatible with due process. For the reasons already set forth in Part III.A., this argument lacks merit. Moreover, the English courts already rejected the Names' attacks on these clauses, *see supra* note 3, and the Court will not indulge Mullin's efforts to relitigate those issues here. *See Ashenden,* 233 F.3d at 478–81

(rejecting argument that enforcement of these clauses violates due process).

Even upon examination of the merits of Mullin's argument on this point, the Court remains unpersuaded. Lloyd's authority to appoint agents is set forth in the Lloyd's Act and implementing bylaws, which Mullin agreed to abide by when he signed the General Undertaking. Lloyd's authority to appoint an agent for purposes of effecting the Equitas Reinsurance Contract was upheld by the English courts. *See supra* note 3. As such, Mullin's argument is primarily one of substance, not procedure, and yet it is *procedural* rights that are at the heart of due process. *See Fuentes v. Shevin*, 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (the "root requirement" of due process is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest"); *Pettibone v. Pennsylvania Bd. of Probation and Parole*, 782 A.2d 605, 608 (Pa.Cmwlth.2001) ("due process is a flexible notion derived from the Fourteenth Amendment that calls for such *procedural safeguards* as a particular situation demands to ensure fundamental fairness to a litigant") (emphasis added); *cf. Ashenden*, 233 F.3d at 480 ("a one-sided contract is a substantive, not a procedural, offense"). Mullin was afforded an opportunity to contest these terms of the Equitas Reinsurance Contract in the English courts, but he lost on the merits. *See supra* at note 3. Thus, Mullin received all the *process* that he was due. The Seventh Circuit outright addressed the same argument when it concluded that a judgment against other American Names should be recognized under the Illinois Recognition Act:

And again the key question is not the fairness of Lloyd's measures but the fairness of the English court in holding that Lloyd's was authorized by its contract with the names to appoint agents to negotiate a contract that would bind the names without the names' consent. This interpretation of the original contract, like the interpretation authorizing Lloyd's to adopt the pay now sue later clause, is not so unreasonable that it could be thought a denial of international due process even if international due process had a substantive component.

*Ashenden*, 233 F.3d at 480–81. This Court agrees with the Seventh Circuit, and thus concludes that recognition of the English Judgment would not so offend Pennsylvania's notions of due process as to require nonrecognition under the public policy exception to the Recognition Act.

Finally, the second component of Mullin's public policy argument is that the Equitas Reinsurance Contract amounts to a contract of adhesion, and thus offends the policies undergirding Pennsylvania contract law. As noted above, the Court must focus on the cause of action in the English Judgment, not the differences in the bodies of law, because mere differences between England's and Pennsylvania's laws do not trigger the public policy exception. *See Turner*, 303 F.3d at 332–33; *cf. Somportex*, 453 F.2d at 443. Rather, the appropriate focus is on the "cause of action" and the "claim for relief." 42 P.S. § 22004(3). The Court reiterates that it does not believe that a breach of contract action or a claim for money damages is repugnant to Pennsylvania public policy.

Moreover, Mullin's objection on this point is to the substance of English law, which permits Lloyd's to demand the Equitas Premium. Even if the Court were to expand its inquiry beyond examining the "cause of action" or "claim for relief," the Court would not conclude that enforcement of the English Judgment would be "repugnant to fundamental notions of what is decent and just in" Pennsylvania. *McCord*, 874 F.Supp. at 439.

It is significant that when Mullin signed the General Undertaking, he agreed that any disputes with Lloyd's would be subject to English law. *See* General Undertaking at ¶ 2.2. Mullin does not contest the validity of this choice of law provision, and several U.S. courts have upheld it. *See, e.g., Haynsworth v. The Corporation,* 121 F.3d 956, 969 (5th Cir.1997); *Riley,* 969 F.2d at 958. As confirmed by the English courts, despite vigorous argument by Mullin and other Names, English law permitted Lloyd's to mandate that all Names purchase reinsurance coverage from Equitas. *See supra* note 3. In these circumstances, the Court is not persuaded that enforcement of the English Judgment is "repugnant to fundamental notions of what is decent and just in" Pennsylvania. *McCord,* 874 F.Supp. at 439.[7]

By way of further support, the Court looks to the many decisions by American courts that have uniformly held that similar English judgments against American Names should be recognized. *See, e.g., Turner,* 303 F.3d 325; *Ashenden,* 233 F.3d 473; *Society of Lloyd's v. Blackwell,* No. 02CV488–J (S.D.Cal. Feb. 24, 2003) (slip opinion), attached to Plaintiff's Second Supplemental Submission in Support of its Motion; *Society of Lloyd's v. Bennett,* No. 2:02–CV–204TC (D.Utah Nov. 12, 2002) (slip opinion), attached to Plaintiff's Supplemental Submission in Support of its Motion; *Society of Lloyd's v. Reinhart,* No. 02–264 (D.N.M.2002) (slip opinion), attached to Plaintiff's Reply Brief at Ex. A; *Society of Lloyd's v. Rosenberg,* No. 02–1195 (E.D.Pa. Aug. 12, 2002) (slip opinion), attached to Plaintiff's Motion at Ex. B; *Society of Lloyds v. Webb,* 156 F.Supp.2d 632 (N.D.Tex.2001), *aff'd,* 303 F.3d 325 (5th Cir.2002); *Society of Lloyd's v. Grace,* 278 A.D.2d 169, 718 N.Y.S.2d 327 (N.Y.App.Div.2000).[8]

## IV. CONCLUSION

Accordingly, having concluded that no grounds exist for nonrecognition of the English Judgment, and there being no genuine issue as to any material facts, the Court will recognize the English Judgment, and it shall be enforced. *See* 42 P.S. §§ 22001–22009; 42 Pa. Cons.Stat. Ann. § 4306. Plaintiff's Motion is granted, and judgment will be entered in favor of Lloyd's.

An appropriate Order follows.

---

**7.** The weakness in this argument is further underscored by Mullin's failure to cite any case law where a court declined to recognize a foreign judgment because it was premised on an unconscionable contract of adhesion.

**8.** Mullin does present some argument seeking to distinguish his case from the many decisions finding in favor of Lloyd's on the same grounds. In his memoranda, Mullin argues that two "heretofore unthinkable developments" had arisen that justified closer scrutiny of the English Judgment. First, he pointed to the *Jaffray* decision, the substance of which was not addressed by any court prior to today. As explained above, the *Jaffray* decision does not compel nonrecognition. Second, Mullin points to an affidavit from his own English Solicitor, Michael David Freeman, in which Mr. Freeman critiques the decisions of the English courts. *See* Plaintiff's Response at Ex. C. Lloyd's contends that Mr. Freeman's affidavit is inadmissible under the Federal Rules of Evidence, but the Court need not reach this issue. Mr. Freeman's affidavit is an interesting "insider's account" of the litigation in England surrounding Lloyd's R & R, but it adds nothing of substance that would compel this Court to reach a different conclusion today. To the contrary, it largely rehashes arguments already considered and rejected by the English courts.

In addition to pressing some legal significance attached to these "developments," Mullin avers that they also raise "factual issues precluding summary judgment for Lloyd's." Defendant's Response to Plaintiff's Supplemental Submission. To the extent that Mullin intends to argue that the *Jaffray* decision and the Freeman Affidavit create genuine issues of material fact, *see* Fed.R.Civ.P. 56(c), such an argument has no merit.

## ORDER

AND NOW, this 27th day of March, 2003, upon consideration of Plaintiff's Motion for Summary Judgment [Docs. # 8, 9], Defendant's Response thereto [Doc. # 10], Plaintiff's Reply Brief in Support of its Motion [Doc. # 14], Defendant's Sur–Reply in Opposition [Doc. # 15], Plaintiff's Supplemental Submission [Doc. # 16], Defendant's Response to Plaintiff's Supplemental Submission [Doc. # 17], Plaintiff's Second Supplemental Submission [Doc. # 18], and for the reasons set forth in the attached Memorandum, it is hereby ORDERED that Plaintiff's Motion is GRANTED.

It is further ORDERED:

1. The March 11, 1998 Judgment entered by the High Court of Justice, Queen's Bench Division, in London, England (the "English Judgment"), against Defendant J. Edmund Mullin, for UK £361,910.95 or $571,891.30 plus interest in the amount of 8% from the date of judgment, is hereby recognized by this Court pursuant to Pennsylvania's Uniform Foreign Money Judgments Act, 42 P.S. §§ 22001–22009;

2. The March 11, 1998 English Judgment against Defendant J. Edmund Mullin, for UK £361,910.95 or $571,891.30 plus interest in the amount of 8% from the date of judgment will be entered with the Clerk for the United States District Court for the Eastern District of Pennsylvania and enforced in accordance with Pennsylvania's Uniform Enforcement of Foreign Judgments Act, 42 Pa. Cons.Stat. Ann. § 4306.

3. The Clerk of Court is hereby directed to mark this case closed for statistical purposes.

It is so ORDERED.