## Mamlin, Appellant, *v.* Genoe et al.

Argued November 29, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Joseph Brandschain,* with him *Herman Brandschain,* for appellant.

*Samuel Feldman,* Assistant City Solicitor, with him *Francis F. Burch,* City Solicitor, *David N. Feldman* and *Edward I. Weisberg,* for appellee.

OPINION BY MR. JUSTICE STERN, January 6, 1941:

Plaintiff entered a judgment by confession against defendant and issued an attachment execution summon-

ing City of Philadelphia Police Beneficiary Association as garnishee. One James A. Genoe held a membership certificate in that association under the provisions of which there was payable a stipulated sum upon his death to beneficiaries who had been designated by him and among whom was defendant, his daughter. James A. Genoe having died, it was defendant's interest in this certificate which plaintiff sought to reach by his attachment, and the question is whether the benefits to which she was entitled are subject to the attachment process of her creditor.

The association which is here garnishee is not to be confused with the City of Philadelphia Police Pension Fund Association. It is a purely private, voluntary organization incorporated under section 2, par. IX, of the Act of April 29, 1874, P. L. 73. Its purpose as stated in its charter is "to maintain a society . . . for the mutual benefit and protection of its members, and provide from moneys collected therein a fund to be paid over upon the death of any member to his widow or orphans, and such or either of them or such other person or persons as the member may have designated, and in the manner of such designation, and in default of such designation to such person or persons as the By-laws of the Association may direct."

The Act of May 20, 1921, P. L. 916, provided for the incorporation and regulation of fraternal benefit societies, defining such a society as one which, organized and carried on solely for the mutual benefit of its members and their beneficiaries and not for profit, has a lodge system with ritualistic form of work and a representative form of government. Section 11 of that act provided that no money or benefit to be paid by any such society shall be liable to attachment, garnishment or other process, or be seized or appropriated by any process or operation of law to pay any debt or liability of a member or beneficiary or any other persons who may have a right thereunder, either before or after pay-

ment. This act was repealed by the Act of July 17, 1935, P. L. 1092, which omitted the requirement of ritualistic ceremonies as characterizing a fraternal benefit association, but retained, in section 16, the provision in regard to the non-attachability of the benefits payable by such a society. The garnishee association in the present case, however, is admittedly not a *fraternal* benefit society, as it does not operate under a lodge system, and, there being no statute relieving from attachment the benefits payable by an ordinary beneficial association, the Court of Common Pleas made absolute plaintiff's rule for judgment against the garnishee. On appeal to the Superior Court that judgment was reversed (139 Pa. Superior Ct. 100, 10 A. 2d 799). The Superior Court conceded that the benefits payable by the garnishee were not the subject of any statutory exemption, but decided that to permit them to be attached "would be contrary to the policy of the state." We cannot agree with this view, as we do not believe that it is within the power of a court, where the legislature has not provided for such an exemption, judicially to declare it on the theory that there is a public policy which requires it.

It is a general principle of the common law that all of a person's assets are liable for the payment of his debts. It is true that some types of property have, by judicial decision, been declared to be absolved from levy or attachment under certain circumstances, for example, wearing apparel and articles on the person of the debtor, property in the custody of the law, a debt due by a public agency, the property of a railroad company necessary to enable it to perform its duties to the public. These, however, are instances in which the court has acted only for the purpose of preventing either a breach of the peace, or interference with the judicial administration of property held under authority of the court, or embarrassment to the government in having public funds made the subject of litigation by rival

claimants, or cessation of the operation of a railroad by depriving it of the means essential to the exercise of its franchise; none of them was based upon considerations of purely economic expediency with reference to the conflicting interests of debtors and creditors.

In our judicial system the power of courts to formulate pronouncements of public policy is sharply restricted; otherwise they would become judicial legislatures rather than instrumentalities for the interpretation of law. "Generally speaking, the legislature is the body to declare the public policy of a state and to ordain changes therein; . . . this is peculiarly so where a matter of expediency is up for consideration. . . . In many cases, on questions of good morals, as opposed to mere expediency, the courts may declare and apply the public policy of the State; . . . again, where an alteration in public policy on any point of general interest has actually taken place, and is indicated by long-continued change of conduct on the part of the people affected, when such a change has become practically universal, the courts may recognize this fact and declare the governing public policy accordingly. . . . But neither of these rules controls the present case; here no question of morality is involved,—it is purely one of expediency,—and no gradual or universal change of customary practice has occurred": *Commonwealth v. Hall*, 291 Pa. 341, 353, 354, 140 A. 626, 630, 631. "Public policy, in the administration of the law by the courts, is essentially different from what may be public policy in the view of the legislature. With the legislature, it may be, and often is, nothing more than expediency. The public policy which dictates the enactment of a law is determined by the wisdom of the legislature": *Enders v. Enders*, 164 Pa. 266, 271, 30 A. 129. "Public policy . . . with the latter [the legislature] . . . may be, and often is, 'nothing more than expediency'; but with the former, [the courts], it must, and may only, be a reliance upon 'consistency with sound policy

and good morals as to the consideration or thing to be done' ": *Riddell v. Pennsylvania R. R. Co.,* 262 Pa. 582, 587, 106 A. 80, 82.

The right of a court to declare what is or is not in accord with public policy does not extend to specific economic or social problems which are controversial in nature and capable of solution only as the result of a study of various factors and conditions. It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring. There must be a positive, well-defined, universal public sentiment, deeply integrated in the customs and beliefs of the people and in their conviction of what is just and right and in the interests of the public weal. Familiar illustrations are those involving unreasonable restraints of marriage or of trade, collusive arrangements for obtaining divorces, suppression of bids for public contracts, interference with freedom of conscience or religion. If, in the domain of economic and social controversies, a court were, under the guise of the application of the doctrine of public policy, in effect to enact provisions which it might consider expedient and desirable, such action would be nothing short of judicial legislation, and each such court would be creating positive laws according to the particular views and idiosyncrasies of its members. Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision.

Applying these principles to the present situation, it would seem clear that, if the benefits payable by beneficial societies are to be exempt from attachment, such objective can be accomplished only by the act of a legislative body and not by the pronouncement of a court. There is nothing in the existing legislation of the state which indicates any such general policy on the part of the lawmaking body. On the contrary, there exist,

side by side, sequences of statutes applying on the one hand to fraternal benefit societies and on the other to beneficial societies which are not fraternal.[1] These two kinds of associations are incorporated under different statutes,[2] and different provisions govern their scope and operations. Considering their dissimilarity in various respects, it would seem to have been because of a valid reason, and not mere oversight, that the legislature provided for an exemption in the one case and withheld it in the other. As far as general public policy is concerned, opinions would no doubt differ as to whether the benefits payable by ordinary beneficial societies should be free from the claims of the creditors of members or their beneficiaries. Indeed, there has been considerable discussion by economists and law commentators as to the desirability and proper extent of all exemption laws.[3] Whether such laws should be broadened or narrowed, and to what classes of debtors and kinds of property they should be applied, can be determined, if at all, only by an investigation of facts and a study of social and economic conditions for which a court is in no wise equipped. Incidentally, it is to be noted in the present instance that the benefits payable by the garnishee association, according to its charter, are not confined to the widow or children of a

---

[1] See, for example, as to fraternal benefit societies, Acts of April 6, 1893, P. L. 7; April 6, 1893, P. L. 10; June 25, 1895, P. L. 280; May 20, 1921, P. L. 916; April 7, 1927, P. L. 177; July 17, 1935, P. L. 1092; May 28, 1937, P. L. 931; June 21, 1939, P. L. 654. As to other beneficial societies, see Acts of May 23, 1891, P. L. 107; April 20, 1927, P. L. 317; April 26, 1929, P. L. 805; June 4, 1937, P. L. 1643; June 24, 1939, P. L. 686. As to statutes applying to both groups, see Acts of April 29, 1874, P. L. 73, § 2, par. IX; May 24, 1893, P. L. 126; June 24, 1897, P. L. 204; June 20, 1919, P. L. 510.

[2] Ordinary beneficial societies under the Nonprofit Corporation Law of 1933, P. L. 289; fraternal benefit societies under the Act of July 17, 1935, P. L. 1092.

[3] See, for example, Folz on "Exemption Laws and Public Policy," 53 Amer. Law Reg. (44 N. S.) 721.

member, but the beneficiaries may be any persons designated by him, so that there is not necessarily involved here the protection of dependents.

We fail to find in the cases relied upon by the garnishee any authority for the proposition that the court may, because of an alleged public policy, exempt from attachment the benefits payable by beneficial societies. In *Kinsloe & Son v. Davis,* 167 Pa. 519, 31 A. 934, it was held that an attachment execution would not lie against a railroad company as custodian of an employees' relief fund where it appeared that, by the rules and regulations of the association, the beneficiary was entitled to payment of the benefits only upon his execution of a certain release, and therefore an attaching creditor was unable to comply with the condition upon which the payment was to be made. The same reason was the basis of the decision in *Ogle v. Barron,* 247 Pa. 19, 92 A. 1071, where by the constitution and by-laws of the association, it was provided that any assignment of a certificate either by a member or a beneficiary was void, and the benefit due upon the death of a member was payable only upon the return of the certificate properly endorsed, which meant, according to the interpretation placed upon it by the court, endorsement by the beneficiary, who alone, therefore, was able to comply with this provision. A similar requirement explains the case of *Craven v. Roberts,* 60 Pa. Superior Ct. 140. None of these decisions was placed upon the ground of public policy, but only on the terms of the contract between the members of the association as set forth in its constitution and by-laws.

Being of opinion, therefore, that the exemption here claimed is not prescribed by any statute of the Commonwealth, and that it cannot be judicially declared as a matter of public policy, we conclude that plaintiff is entitled to judgment against the garnishee.

The judgment of the Superior Court is reversed, and the judgment of Court of Common Pleas No. 3 of Philadelphia County is reinstated and affirmed.